IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. PINGEL


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

ANTHONY E. PINGEL, APPELLANT.


Filed July 25, 2023.    No. A-22-960.


Appeal from the District Court for Adams County: MORGAN R. FARQUHAR, Judge. Affirmed.

Christopher J. Roth, of Roth Weinstein, L.L.C. for appellant.

Michael T. Hilgers, Attorney General, and Matthew Lewis for appellee.


RIEDMANN, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

INTRODUCTION

In the early morning of December 12, 2021, Anthony E. Pingel drove his vehicle in rural Adams County, Nebraska, while under the influence of alcohol. He failed to stop at an intersection and struck another vehicle, causing it to roll and burst into flames. Two people died and two others were injured. Pingel ultimately pled no contest to two counts of manslaughter, two counts of third degree assault, and one count of driving while under the influence of alcohol. The Adams County District Court sentenced him to 18 to 20 years' imprisonment for each manslaughter conviction; one year of imprisonment for each third degree assault conviction; and 60 days' imprisonment, a $500 fine, and a 6-month license revocation, for the driving while under the influence of alcohol conviction. All sentences were ordered to run consecutively. Pingel claims that the district court imposed excessive sentences and that his trial counsel was ineffective for recommending he take an insufficient plea agreement rather than proceed to trial. We affirm.

- 1 -

## BACKGROUND

On January 25, 2022, the State filed an information charging Pingel with six counts: counts 1 and 2, motor vehicle homicide, a Class IIA felony, pursuant to Neb. Rev. Stat. § 28-306(3)(b) (Reissue 2016); counts 3 and 4, third degree assault, a Class I misdemeanor, pursuant to Neb. Rev. Stat. § 28-310(1) (Reissue 2016); count 5, driving under the influence of alcohol "(Blood .15 or greater) - First Offense," a Class W misdemeanor, pursuant to Neb. Rev. Stat. § 60-6,196 (Reissue 2021); and contempt of court, pursuant to Neb. Rev. Stat. § 25-2121 (Reissue 2016). On January 27, Pingel entered a written plea of not guilty.

On September 23, 2022, the State filed an amended information charging Pingel with five counts: counts 1 and 2, manslaughter, a Class IIA felony, pursuant to Neb. Rev. Stat. § 28-305; counts 3 and 4, third degree assault, a Class I misdemeanor; and count 5, driving while under the influence of alcohol "(Blood <.15) - First Offense," a Class W misdemeanor. On September 26, the district court held a hearing where, pursuant to a plea agreement, Pingel changed his plea to no contest. At the hearing, the State informed the court that the amended information was filed as part of the plea agreement and that the parties had agreed they would "be free to argue at sentencing." The court confirmed with Pingel that this was his understanding of the plea agreement. The court informed Pingel of the possible penalties for all five counts of the amended information and informed him that he would be giving up certain rights upon entering a plea of guilty or no contest. Pingel then entered a plea of no contest on all five charges of the amended information.

The State offered into evidence two affidavits authored by law enforcement "for purposes of a factual basis." The district court asked Pingel's trial counsel whether there was any objection to receipt of the affidavits into evidence, to which counsel responded, "No, Your Honor." The court then received the affidavits into evidence and indicated that it would "take a moment to review those exhibits."

Together, the affidavits show that on December 12, 2021, a motor vehicle accident took place in "the area of 12th Street and Blaine in rural Adams County," where Pingel, driving a 2015 silver Jeep registered in his name,

> violated the northbound [s]top [s]ign on Blaine Ave. [A]nd because of this action he struck an eastbound Black Dodge Ram . . . occupied by 4 individuals. The resulting accident caused the Black Dodge Ram to enter the northeast ditch[,] landing on its passenger side. The accident and ensuing vehicle fire resulted in the deaths of two of the occupants who had been inside the eastbound Black Dodge Ram.

Pingel's Jeep was located "just east of the engulfed pickup truck" and had "extensive front end damage." Individuals who responded to the accident stated that they saw Pingel walking near or away from his damaged vehicle. Upon law enforcement's arrival, a deputy from the Adams County Sheriff's Department spoke with Pingel and detected the odor of alcoholic beverage coming from Pingel. Pingel was observed to have "blood shot eyes, slurred speech[,] and he wasn't . . . responding coherently to questions by medical staff or others on the scene." He was "unable to keep balance and was stumbling." Additionally, "[w]hile walking to the medical service unit," Pingel was "very clumsy" and "stumbled around until laying down on the stretcher."

Pingel was transported to a hospital, where an acquaintance of Pingel was present and made the statement, "I knew [Pingel] shouldn't have been driving." Law enforcement then advised Pingel that "he was being placed under arrest for [d]riving [u]nder the [i]nfluence" and asked him to submit to a "Post Arrest Chemical Test." Pingel refused to submit to such testing. After obtaining a search warrant, law enforcement again asked Pingel to submit to chemical testing and was "advised that failure to comply with the [s]earch [w]arrant would result in an additional charge." Pingel again refused to consent to chemical testing.

Following the district court's review of the affidavits received into evidence, Pingel's trial counsel stipulated that the accident described in the affidavits "resulted in the injuries and death[s] of the individuals described or identified in Counts I through IV." The court found that "the plea [was] knowingly, intelligently, [and] voluntarily made and the factual basis exist[ed] to find [Pingel] guilty of Counts I, II, III, IV, and V of the Amended Information" and found Pingel guilty of the same. The court ordered a presentence investigation, "to include a drug and alcohol evaluation."

At a hearing held on December 5, 2022, the district court sentenced Pingel to 18 to 20 years' imprisonment for each manslaughter conviction; 1 year of imprisonment for each third degree assault conviction; and 60 days' imprisonment, a $500 fine, and a 6-month license revocation (with authorization for an ignition interlock device and, if applicable, credit for any administrative license revocation) for the driving while under the influence of alcohol conviction. Pingel received credit for 2 days already served. The court indicated that all sentences were to run consecutively, "as each crime and each victim deserves their own separate sentence." A corresponding file-stamped order was entered the following day.

Pingel appeals.

## ASSIGNMENTS OF ERROR

Pingel assigns that (1) the district court abused its discretion by imposing an excessive sentence and (2) he received ineffective assistance of counsel "by trial counsel recommending an insufficient plea agreement and not proceeding to trial."

## STANDARD OF REVIEW

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020).

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

## ANALYSIS

### EXCESSIVE SENTENCE

Pingel claims the district court abused its discretion when it imposed an excessive sentence. Pingel was convicted of two counts of manslaughter, a Class IIA felony, which is punishable by

up to 20 years' imprisonment. See Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2022). For those convictions, the court sentenced Pingel to 18 to 20 years' imprisonment. Pingel was also convicted of two counts of third degree assault, a Class I misdemeanor, which is punishable by up to 1 year of imprisonment. See Neb. Rev. Stat. § 28-106(1) (Cum. Supp. 2022). For each of those convictions, the court sentenced Pingel to 1 year of imprisonment. Finally, Pingel was convicted of driving while under the influence of alcohol "(Blood <.15) – First Offense," a Class W misdemeanor, which is punishable by up to 60 days' imprisonment and a $500 fine, and pursuant to Neb. Rev. Stat. § 60-6,197.03(1) (Reissue 2021), requires a driver's license revocation for "six months from the date ordered by the court." For this offense, Pingel was sentenced to 60 days' imprisonment, a $500 fine, and had his driver's license revoked for 6 months. Each of Pingel's sentences was within its respective statutory range. As such, we review the court's sentencing determination only for an abuse of discretion.

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Lierman, supra*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Pingel was 33 years old at the time of sentencing. According to the presentence investigation report (PSR), Pingel was single and had no children. He had a bachelor's degree and was preparing to begin a new job before the accident took place. Pingel's criminal history includes one prior conviction for careless driving in 2021, where he received a $100 fine.

The 438-page PSR includes a case report from the Nebraska State Patrol Division of Traffic Services, an accident reconstruction report, and a 238-page incident report from the Adams County Sheriff's Department, which shows that the two deceased victims of the accident were 16 and 18 years old and the two survivors were also teenagers at the time of the accident. The PSR also includes numerous character reference letters written in support of Pingel, describing Pingel's positive impact on his community, along with victim impact statements from family members of the victims of the accident. The victim impact statements detail the victims' families' experiences with grief, depression, PTSD, and financial hardship resulting from the accident. They also reveal that one of the survivors was ejected from the vehicle at the time of the accident and was hospitalized for a week. This survivor submitted a victim impact statement, indicating that as a result of the accident, he suffers from a traumatic brain injury, post-traumatic stress disorder, and depression.

The PSR also includes a written statement by Pingel describing his history of alcohol dependency. He began drinking in high school to cope with the struggles of being "ashamed of who [he] was" and he carried this behavior with him to college, where his dependency on alcohol was exacerbated when he lost a friend to suicide. Following his friend's death, Pingel "spent a month just binge drinking to numb the pain." Pingel relied upon alcohol to "hide [his] insecurities, pain, and true self from everyone . . . for the next 10 years" and "[d]uring that time, [he] realized that [he] had a problem with binge drinking." This "scared [him] because quite a few times [he]'d

wake up and have no memory of the previous night." He began taking precautions when he went out drinking by using a taxi service or having his friends or bar staff drive him home.

According to Pingel, on the night of the accident, he was at an outing with his friends and he "knew [he] would be drinking so [his] friend who was pregnant at the time was going to be [his] DD." He took several shots and drank several beers and "the next thing [he] remember[ed] was waking up in the hospital." He wished he "wouldn't have drank, wouldn't have driven," and that "two kids didn't die, two others weren't hurt." He felt "guilt, shame, and sadness" but hoped to "make a difference" someday by sharing his story so "others may learn from [his] failures and make wiser choices than [he] did that night." He wrote apology letters to the survivors of the accident, the families of the deceased, and the first responders who were present at the scene of the accident.

As part of the presentence investigation, the probation officer conducted a "Level of Service/Case Management Inventory." Pingel was assessed as a "low" risk to reoffend. He scored in the "very low" risk range in the criminogenic risk factor domains for criminal history, education/employment, family/marital, leisure/recreation, companions, pro-criminal attitude, and antisocial pattern. He scored in the "high" risk range in the domain for alcohol/drug problems.

The probation officer also detailed the results of Pingel's substance abuse evaluation. It was found that Pingel "was diagnosed with [a] . . . depressive disorder and moderate alcohol use disorder in early remission." The probation officer reported that Pingel began drinking at the age of 15 and his last drink was the night of the accident. Prior to the accident, Pingel "was drinking 1-2 nights per week and having about 6-8 drinks per episode." Pingel admitted to the probation officer that he was a "binge drinker" and had "suffered from quit[e] a few blackouts over the years, possibly 10."

At the sentencing hearing, the State described the circumstances of the accident, stating that, while traveling at a high rate of speed, Pingel failed to yield at a stop sign and struck the victims' vehicle. The vehicle rolled into a ditch and was quickly engulfed in flames. Two victims escaped the vehicle but the two that did not, died from blunt force trauma and thermal trauma. The deceased victims had to be identified using DNA testing and dental records due to the conditions of their bodies. The State noted that, according to the accident reconstruction report contained in the PSR, the Nebraska State Patrol determined that:

> Pingel was operating his vehicle with a wanton disregard for public safety when he ignored a "stop ahead" advanced-warning sign, failed to significantly reduce his speed while approaching an intersection with an obstructed view, failed to stop at the stop sign, and failed to yield the right-of-way.

The State further described the impact of the accident on the victims of the incident who survived, as well as the families of all the victims. The State then recommended that, "based on the circumstances of the offenses and the wishes of the victims," Pingel "receive the maximum sentence permissible on each count: 19-20 years on Counts I and II, 1 year on Counts III and IV, and 60 days on Count V." The State further noted that, although "this may have been one incident, it is important to remember that there are four separate victims" and that "Pingel needs to be held accountable for what he did to each of them and their families." As such, the State further recommended that Pingel's sentences for each conviction be served consecutively.

Pingel's trial counsel also addressed the district court, arguing that "Pingel is a good man who made a mistake." Counsel noted that Pingel was involved in church activities and had a bachelor's degree, a history of gainful employment, and no criminal history. Counsel further pointed out that numerous individuals submitted character reference letters on Pingel's behalf. All of this showed that Pingel had "lived a positive life and that this was something certainly out of the . . . ordinary for him." On the night of the accident, "Pingel left . . . with no intention of harming anyone." Although "what happened that night was tragic," it did not change Pingel's good character. Counsel argued that "if we didn't have two deaths and injuries, . . . Pingel [would] certainly qualif[y] to be . . . placed on probation." Counsel then asked the court to "impose a sentence which balances the needs of society with the treatment of a defendant with the characteristics of" Pingel.

Pingel personally informed the district court that he had been consumed by "[g]uilt, shame, and regret" since the accident. He promised to honor the victims of the accident by sharing his story to "hopefully prevent something so tragic from happening to other families." He apologized to the families of the victims, his own family, and the court. Finally, he stated that he took "responsibility for [his] mistake" and would "humbly accept the consequences" and "fulfill[] the sentence without incident."

In his brief on appeal, Pingel refers to Neb. Rev. Stat. § 29-2260(3) (Reissue 2016), which sets out various factors which "shall be accorded weight in favor of withholding [a] sentence of imprisonment" by a sentencing court. He argues that nearly all of the 11 listed factors weighed in favor of withholding a sentence of imprisonment in his case. He contends that "if no deaths were involved," he would have been "a candidate for probation." Brief for appellant at 14. He admits that "factoring in the two deaths, the court certainly was within its discretion to impose imprisonment." *Id.* However, he states that the court inappropriately "treated [him] the same as if he had an extensive criminal record, showed no remorse[,] and did not [accept] any responsibility" by "imposing . . . the maximum sentences." *Id.* at 14-15.

Pingel goes on to cite to numerous Nebraska cases which affirmed maximum sentences due in part to the appellants' lengthy criminal records. In essence, he argues that the district court abused its discretion in this case by imposing the maximum sentence for each conviction when there were sentencing factors which weighed in favor of a lesser sentence. He also contends that by requiring the sentences to run consecutively, the court "is not providing any hope of rehabilitation to a person who, but for this incident, has led a law abiding life." Brief for appellant at 17.

At sentencing, the district court extensively discussed its reasoning, stating that it had considered Pingel's age, mentality, education and employment, social and cultural background, criminal history, prior law-abiding conduct, motivation for his offenses, the nature of each offense, and whether there was violence, injury, or death as a result of his actions. The court also stated that it had reviewed "every page of the PSI, all probably 450 pages of it, three times," which contained all the information that Pingel contends weighs in favor of a lesser sentence.

The district court specifically acknowledged Pingel's statement contained in the PSR, stating that it did not "buy . . . for one second" that Pingel having a "contingency plan of having a designated driver that night somehow mitigate[d] this at all." It reasoned that Pingel drove his vehicle "to this person's home knowing full well that [he] intended to drink and probably drink to

excess, and having a designated driver for one portion of what amounted to a fairly long trip where [he] knew that [he was] going to be drinking -- it's not good enough. It's meaningless." It stated that Pingel was not "a 19-year-old who had their first sip of alcohol and wasn't fully aware of the consequences." He had been "doing this for 10 years" and it was "reckless and a wanton disregard for the safety of the public for [him] to knowingly drink to the point of intoxication and to get in [his] vehicle." The court characterized Pingel as a "ticking time bomb for the last 10 years . . . based off of [Pingel's] own admissions" that he historically "drank to excess to a point where [he could not] remember what [he] did or where [he was]." And rather than "stop[ping] drinking or alter[ing] [his] drinking habits," he simply tried to "find different designated drivers." The court concluded that Pingel's "pattern of drinking [him]self out of reality resulted in a tragedy that killed two people and injured two more teenagers."

The district court noted the impact of the accident on not only the families of the victims and the victims themselves, but also the witnesses to the "carnage and the aftermath of the collision," including "the good people that rushed to try and extinguish the fire and to rescue the people trapped in the vehicle" who would have to "carry the images of what they saw and heard and smelled for the rest of their lives."

To the extent that Pingel implicitly argues the district court placed too much emphasis on the deaths and injuries of the victims, or not enough emphasis on the factors he contends weigh in favor of a lesser sentence, we note that it was within the discretion of the court to weigh more heavily certain sentencing factors over others since the appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life, and a sentencing court is accorded very wide discretion in imposing a sentence. See *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017). We further note that, it is generally within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively. See *State v. Lantz*, 290 Neb. 757, 861 N.W.2d 728 (2015).

Accordingly, while we agree there are some mitigating factors which weigh in favor of a lesser cumulative sentence, we cannot say that the district court abused its discretion in determining the sentences imposed.

INEFFECTIVE ASSISTANCE OF COUNSEL

Pingel claims he received ineffective assistance of trial counsel "by trial counsel recommending an insufficient plea agreement and not proceeding to trial." Brief for appellant at 17. He argues that "the record is clear that by not proceeding to trial," he was "prejudiced by receiving additional sentences." *Id*. He suggests, "Assuming, arguendo, the evidence was sufficient for a conviction on each charge of Motor Vehicle Homicide, the best case scenario is to reduce the risk of [Pingel] on the other charges since probation under these circumstances involving death was slight." *Id*. at 18-19. He contends "an experienced defense attorney would also know that a lengthy jail sentence was likely" and therefore "the key was to attempt to reduce the possibility of the number of convictions and the possibility of consecutive sentences." *Id*. at 19.

Generally, a voluntary guilty plea or plea of no contest waives all defenses to a criminal charge. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). Thus, when a defendant pleads

guilty or no contest, he or she is limited to challenging whether the plea was understandingly and voluntarily made and whether it was the result of ineffective assistance of counsel. *Id.*

Pingel is represented by different counsel on direct appeal than he was at trial. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *Id.* Once raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). A record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *State v. Theisen*, 306 Neb. 591, 946 N.W.2d 677 (2020).

To prevail on a claim of ineffective assistance of counsel, the defendant must show that his or her counsel's performance was deficient, and that this deficient performance actually prejudiced the defendant's defense. See, *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Anderson*, 305 Neb. 978, 943 N.W.2d 690 (2020). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *State v. Blaha, supra*. In a plea context, deficiency depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases. *Id.* When a conviction is based upon a guilty or no contest plea, the prejudice requirement of an ineffective assistance of counsel claim is satisfied if the defendant shows a reasonable probability that but for the errors of counsel, the defendant would have insisted on going to trial rather than pleading guilty. *Id.* The two prongs of the ineffective assistance of counsel test under *Strickland* may be addressed in either order. *State v. Blaha, supra*.

Pingel contends that he "gained nothing by the plea agreement" because he "faced two Class IIA felonies, two Class I [m]isdemeanors[,] and a Class W [m]isdemeanor" under both the original information and the amended information, and as a result he pled "to the same penalties just to a different statute." Brief for appellant at 19. Pingel argues that "[t]he bottom line is that defense counsel should have held out for the misdemeanor[] charges to [be] dismissed and/or the State remaining silent at sentencing which probably would have led to less years of incarcerations." *Id.* at 20.

We agree with the State that the record refutes Pingel's claim. Prior to accepting Pingel's plea, the district court explained each of the charges in the amended information, as well as the sentencing range associated with each charge. The court also confirmed with Pingel that he understood the terms of the plea agreement. The following colloquy then took place:

> THE COURT: Have you had enough time to speak with your attorney about your intended plea in this case and the plea agreement that has been reached?
>
> DEFENDANT: Yes, Your Honor.
>
> THE COURT: Do you believe that you've had sufficient time and are prepared to enter a plea today?
>
> DEFENDANT: Yes, Your Honor.
>
> THE COURT: Have you and are you generally satisfied with the advice and services that your attorney has provided to you in this case?
>
> DEFENDANT: Yes, Your Honor.

THE COURT: Do you wish to take any time to consult with your attorney before I ask you to enter a plea to the Amended Information?

DEFENDANT: No, Your Honor.

THE COURT: Mr. Pingel, I also have to advise you that if you enter a plea of guilty or no contest, that you'll be giving up all the rights that were previously explained to you, including your right to trial, your right to call and cross-examine any witnesses in this case.

If the plea is entered and the State can provide a sufficient factual basis, you would be found guilty of the five amended counts contained in the Amended Information without the necessity of a trial. Do you understand that?

DEFENDANT: Yes, Your Honor.

THE COURT: And has anyone threatened you, pressured you, or made any promises to you to get you to enter into this plea agreement?

DEFENDANT: No, Your Honor.

The plea colloquy shows that Pingel confirmed to the district court that he had discussed the plea agreement with trial counsel. He declined to further discuss the agreement with his counsel prior to entering his plea when given the opportunity to do so. Moreover, Pingel affirmatively responded when asked if he was satisfied with the advice and services provided by his attorney. Pingel was also informed of the charges and the possible consequences, he confirmed that he understood the terms of the plea agreement, and he stated that he understood that he was waiving certain rights, including the right to go to trial, by entering a plea of no contest. Finally, he informed the court that he had not been threatened, pressured, or made any promises so he would enter the plea agreement. Having affirmatively represented to the court that he had discussed the plea agreement with his counsel and that he was satisfied with the advice and services rendered, Pingel cannot now claim his counsel performed deficiently by recommending he enter the plea agreement. The terms of the agreement were clear and were precisely what Pingel agreed to; that his plea resulted in sentences with which he is unhappy does not equate to ineffective assistance of counsel.

Further, with regard to Pingel's argument that trial counsel should have attempted to reduce the number of convictions and the possibility of consecutive sentences, the record shows that the State was not inclined to drop the additional charges because, as the State noted at sentencing when requesting that Pingel's sentences run consecutively, "there [we]re four separate victims" and the State wanted Pingel "to be held accountable for what he did to each [victim] and their families." Neither Pingel's trial counsel nor the State could negotiate regarding whether the sentences would be served consecutively or concurrently, as such a decision is left entirely to the trial court. See *State v. Canaday*, 307 Neb. 407, 949 N.W.2d 348 (2020) (generally, it is within trial court's discretion to direct sentences imposed for separate crimes be served either concurrently or consecutively).

We also conclude that Pingel cannot show that he was prejudiced by trial counsel's alleged deficient performance. Pingel was originally charged with two counts of motor vehicle homicide, two counts of third degree assault, one count of driving while under the influence of alcohol "(Blood .15 or greater) - First Offense," and one count of contempt of court. As a result of the plea agreement, the motor vehicle homicide charges were replaced with manslaughter charges, which resulted in Pingel no longer facing the possibility of losing his driver's license for 1 to 15 years.

See § 28-306(3)(b). There was also a reduction under the amended information for the driving under the influence charge, which was changed to "(Blood <.15) - First Offense," meaning Pingel would not face a 1-year driver's license revocation. See § 60-6,197.03(2). Pingel argues that avoiding any license revocation did not actually benefit him because he would be incarcerated during the revocation period. However, that may not have been true had the district court sentenced differently, and such a decision is not one that trial counsel could have been expected to predict. Regardless, Pingel still received a benefit from the plea agreement because the contempt of court charge was completely dropped and trial counsel was able to argue at sentencing that Pingel should receive a lesser sentence for "tak[ing] responsibility for what happened that night . . . through his plea and his participation . . . in . . . the PSI."

In addition, Pingel does not contest the facts constituting the crimes with which he was originally charged and there was an abundance of evidence against Pingel, including numerous witnesses who saw him at the scene of the accident displaying signs of intoxication, the presence of a vehicle with extensive front-end damage registered in Pingel's name at scene of the accident, the availability of two of the victims who survived, and the autopsy reports of the two deceased victims indicating that the cause of death of the victims was blunt force trauma and thermal trauma from the accident. Had Pingel gone to trial on the original charges, there was a strong possibility that he would have been convicted of all the charges and he would still have been at risk for consecutive sentences, along with the added possibility of having his driver's license revoked for up to 15 years on each motor vehicle homicide charge. Given the benefits of the plea agreement and the ample evidence against him, Pingel cannot show that, but for trial counsel's performance, there was a reasonable probability he would have insisted on going to trial. As such, this claim of ineffective assistance of trial counsel is refuted by the record.

## CONCLUSION

We affirm Pingel's sentences and conclude that his claim of ineffective assistance of trial counsel fails.

AFFIRMED.